UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
REMEDY ROSSO,                          :

                    Plaintiff,          :

          -against-                     :

PI MANAGEMENT ASSOCIATES,               :
L.L.C.,
                                        :
                    Defendant.

                                        :
----------------------------------------------------X

**OPINION and ORDER**

02 Civ. 1702 (KNF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/23/05

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

In this action, plaintiff Remedy Rosso ("Rosso") alleges violations of the Fair Labor

Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the Americans with Disabilities Act, 42

U.S.C. §§ 12101 *et seq.* ("ADA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e *et seq.* ("Title VII"). Rosso contends that the defendant, Pi Management Associates,

L.L.C. ("Pi Management"), refused improperly to pay him overtime during the period of his

employment and terminated his employment because of his disability and race. Rosso seeks to

recover from the defendant $237,353.92 in damages, plus interest, reasonable attorney's fees and

costs.

Pursuant to 28 U.S.C. § 636(c), the parties consented to having the non-jury trial of this

action presided over by a United States magistrate judge. That trial has been completed. The

following are the Court's findings of fact and conclusions of law, made pursuant to Rule 52 of

the Federal Rules of Civil Procedure.

# I. FINDINGS OF FACT

Rosso was born on September 8, 1948, in the Dominican Republic. He lives in the Bronx, New York. Pi Management is a corporation organized and existing under the laws of the state of New York with its principal place of business at 57-08 39th Avenue, Woodside, New York. Pi Management manages the building located at 339 Fifth Avenue, New York, New York ("Building").

On September 16, 1997, the Building was purchased by JPK Associates, L.L.C. ("JPK"). Rosso had been employed by the seller, The Simon's Co., prior to the purchase of the Building and was kept on by JPK as a building superintendent. Initially, the Building was managed by Best Color Payroll Service, which paid Rosso's salary. In January 1998, Best Color Payroll Service changed its name to Pi Management. Thereafter, Pi Management paid Rosso's salary. During the time that Rosso worked for Pi Management, from September 1997 to November 1999, he was supervised by Property Coordinator Vera Penn ("Penn").

*Pay Rate and Hours Worked*

At trial, Rosso testified concerning the circumstances of his employment with Pi Management. Rosso stated that when he was hired by Pi Management, in September 1997, he had already worked at the Building for about two years. Rosso stated that he believed that his experience at the Building, his previous training and his knowledge of electrical systems and building maintenance, made him a valuable employee to Pi Management. Rosso explained that when he needed to make reports about problems at the Building, he would direct them to Penn.

According to Rosso, when he was employed by The Simon's Co., he worked 40 hours per week and earned $550. Rosso stated that when he began working for Pi Management the terms

2

of his employment were the same, that is, he worked from 7:00 a.m. until 4:00 p.m., with one hour off for lunch, and earned $550 per week. After he had been working for Pi Management for one week, however, he was told that his hours had changed and that he would be working from 8:00 a.m. until 5:00 p.m. Rosso was then told that he was required to begin work at 7:00 a.m., as before, so that he could be at the Building when the garbage was collected. Furthermore, Rosso explained, when he worked for The Simon's Co., he was given an hour off for lunch and was permitted to leave the Building during that time. However, after he was hired by Pi Management, he was instructed by Penn to remain in the Building during his lunch hour; from then on, Rosso always ate his lunch at his desk in the lobby.

Rosso also testified that he regularly worked more than 50 hours per week because of problems at the Building, such as the timing of garbage collection, and because he was required to perform the duties of a doorman for the Building as well as those of a superintendent. Rosso testified that he was paid overtime only once, that he often complained to Penn that he was owed overtime and that Penn promised "many times" that he would be compensated for his extra hours of work. Rosso stated that Penn had told him that the reason he had not been paid overtime was that Pi Management was renovating the Building and did not have any tenants.

Penn also testified at trial. She stated that Pi Management was a real estate management company responsible for twelve commercial buildings and that James Pi, the owner of Pi Management, also owned a photo business, a cruise business and a retail business. According to Penn, all of James Pi's businesses were located at 57-08 39th Avenue in Woodside, New York, and shared certain administrative services, such as payroll. Penn stated that, as Property Coordinator for the company, she handled landlord/tenant matters and also supervised the

3

company's building superintendents and doormen. Penn confirmed that plaintiff was a superintendent and doorman at the Building, that he worked Monday through Friday from 7:00 a.m. until 5:00 p.m., and that she was his supervisor. Penn acknowledged that the plaintiff was a "pretty good worker."

Penn also testified that about eight or nine people worked for Pi Management; however, when she was shown a list of the company's employees for the years 1999 and 2000, she acknowledged that eleven people had been employed by the defendant during that time. Moreover, Penn also acknowledged that at least four people who worked for Pi Management in 1999 and 2000 were excluded from the list. When asked whether Rosso had been told that he was entitled to a 30-minute lunch break, Penn stated that she did not remember, but that "everybody has 30 minutes for lunch." Penn stated that she did not know whether any other employee was ever sent to relieve Rosso when he took his lunch break at the Building and, in any case, she had never directed any employee to perform this task.

In support of his contentions, the plaintiff submitted time sheets prepared by him during the period of his employment with Pi Management, that is, September 22, 1997, through November 12, 1999. Each time sheet covers a two-week period and contains information provided by the plaintiff, including his name, the beginning and ending dates of the pertinent pay period and, for each day that he worked, his time "in" and "out." In addition, each time sheet contains handwritten notes indicating the number of hours plaintiff worked each day, as well as the total number of hours he worked during each two-week pay period. Plaintiff testified that he did not know who had written the notes. The time sheets show that plaintiff worked between 90 and 108 hours per pay period.

4

The plaintiff also submitted copies of his earnings statements. The statements indicate that plaintiff received gross pay in the amount of $1,100 every two weeks during the period of his employment. The statements also show that he received $30 in overtime pay during the period ending December 11, 1998, and $49.50 in overtime pay during the period ending April 2, 1999.

*Disability Claim*

Rosso also testified concerning his medical condition. He stated that he suffers from Bell's Palsy and is sensitive to sunlight, and that this condition causes his eyes to tear when he is exposed to sunlight. As a result, Rosso is unable to work outside during daylight hours. Rosso testified that he first began to experience this sensitivity and other problems in November 1999, while he was working for Pi Management. On November 5, 1999, plaintiff noticed a strong chemical odor in the Building; afterward he experienced dizziness and felt pain in his face and eye. He went outside to an area at the back of the Building seeking fresh air. However, when he returned to the Building, he again felt pain in his head and around his eye. Rosso attempted to contact Penn but was unable to do so. He then stood in front of a surveillance camera located in the Building in order to demonstrate his condition. When Rosso's shift ended that day, he sought medical care. Rosso was diagnosed with Bell's Palsy and continues to experience symptoms of this condition.

On November 8, 1999, Rosso returned to work and contacted Penn. He informed her of his condition and asked for a one-week vacation. Penn agreed to the request. Rosso returned to work again on November 16, 1999, for approximately two hours, and then visited his physician, Dr. Albert Comas. Rosso received a medical report from Dr. Comas on that date and sent the report by facsimile to Pi Management. The report stated: "Mr. Remedy Rosso is not able to work

at the present time because of his medical condition. Mr. Rosso is under treatment for a left facial palsy and dizziness with some loss of balance. Return to work November 30, 1999 if stable."

On or about November 23, 1999, Rosso submitted to Pi Management a Notice and Proof of Claim for Disability Benefits, signed by Dr. Comas, indicating that Rosso had received treatment, was unable to work because of his disability and would be able to perform his usual work on November 30, 1999. On or about December 13, 1999, Rosso submitted to Pi Management a letter from Dr. Comas which stated: "Mr. Remedy Rosso is not medically clear to return to work at this time."

At trial, Rosso testified that he called Penn in March 2000 and told her that he wanted to return to work. He stated: "I tried to return to work by phone call to Vera [Penn] about March. I explained to her, due to my condition, if they can let me do the job -- if I can so it will be OK. If I don't come, send me home. I told to her that." Plaintiff testified that he was not offered a position at that time. Plaintiff stated that he then contacted Penn in May or June 2000 and asked if he could return to work. Again, plaintiff testified, he was not offered a position with Pi Management.

Penn, testifying at trial, acknowledged that she had received medical reports from the plaintiff after he stopped working in November 1999, but asserted that, between November 1999 and July 2000, Rosso never sought to return to work. However, Penn also stated that Rosso had called her in early 2000. On that occasion, according to Penn, Rosso asked her how she was and whether she had any job openings. Penn told him that the job was "already taken." Penn also testified that she had never told Rosso that she would keep his job open for him. When

6

questioned further about the March 2000 telephone conversation with Rosso, Penn testified as follows:

> Q.     Did you ever have a friendship call with Mr. Rosso in the year 2000 where you told him that something was available with Pi Management?
> A:     But this position is, the job opening is not for 339 Fifth Avenue.
> Q:     Ms. Penn, that's not my question.  I'm asking you, did you ever have a friendship call with Mr. Rosso in early 2000 where you told him that there was a doorman position open with Pi Management?
> A:     I did not call him.

Thereafter, on July 21, 2000, Rosso mailed a certified letter to Pi Management.  That letter stated: "Attention Mrs. Vera Penn. Attached is my last medical report. Please let me know your decision by mail only." The medical report mentioned in plaintiff's letter, which was prepared by Dr. Comas for the state of New York Workers' Compensation Board ("WCB"), indicates, *inter alia*, that plaintiff is disabled, that the disability is "total," and that, beginning in July 2000, plaintiff could do limited work.

In his trial testimony, Rosso explained that he had asked to be informed of Penn's decision "by mail only" because he suspected that something was "going wrong about [his] job position." Rosso stated that he had tried "many time[s] to go back to work" for the defendant when he was able to perform the functions of his superintendent position, but was never given the opportunity.  According to Rosso, between December 1999 and July 2000, he called Penn approximately ten times and apprised her of his medical condition.  Rosso never worked for Pi Management after November 1999.  He was replaced as a superintendent shortly after he sent his first medical report to Penn. According to Rosso, when Pi Management denied him his old position, he briefly obtained similar work as a building superintendent elsewhere but was unable to find a permanent position.  Rosso stated that he was currently employed as a parking attendant

7

at an indoor parking garage.

On January 31, 2002, the WCB issued a reserved decision denying plaintiff's claim for disability benefits, based on its finding that plaintiff's Bell's palsy was not causally related to any incident at work. An administrative decision affirming the disallowance of plaintiff's claim was issued by the WCB on December 11, 2002.

*Race Discrimination Claim*

At trial, Rosso testified that he was born in the Dominican Republic and that he is a Hispanic man with black skin. Rosso also stated that he did not receive health insurance or overtime compensation while he was employed by Pi Management, although he believed other superintendents or doormen received such a benefits. Rosso explained that, when he attempted to return to work in 2000, he learned that he had been replaced by an Asian man.

Rosso testified that, on several occasions, Penn had visited the Building and had asked him to call her a taxi cab as she was leaving. According to Rosso, on those occasions, he was instructed by Penn not to stop any taxi cabs that were driven by black men. In addition, Rosso stated, Penn refused more than once to get into a taxi cab driven by a black man.

Penn also testified concerning Rosso's claim of race discrimination. In response to questioning, she stated that, of the doormen who worked for the defendant in 1999 and 2000, only one was Hispanic and black, namely the plaintiff. Penn also stated that her assistant, Ms. Taylor, who had worked for her since 1987, was a black woman.

Penn stated that, after Rosso became ill, he was replaced by an Asian man who had worked the night shift previously, and that the night shift was then assigned to an individual named Goran Spadina. She also stated that, in March 2000, the defendant hired another Asian

8

man, Mr. Liu, to fill Rosso's position. Penn testified further that, sometime after November 1999, Pi Management hired two Hispanic individuals: Francisco Mendez, who was hired to work as a doorman in a building in Flushing, New York, and Eliezer Lopez, who was hired to work as a part-time doorman at an unspecified location.

Penn denied that she had ever told Rosso not to call any taxi cabs driven by black men. In addition, Penn stated that she was enrolled in a health insurance plan provided by the defendant but that she did not know whether this benefit was provided to any of the doormen employed at the company.

Documentary evidence submitted at trial shows that the individuals who replaced plaintiff in the capacity of Building superintendent were Goran Spadina, who is of European ancestry, and Da Wei Yiu, who is Chinese. Da Wei Yiu, who had worked for the defendant on a part-time basis between June 1999 and November 1999, became a full-time employee, replacing the plaintiff, on November 17, 1999. In addition, although the record is not clear on this point, Goran Spadina appears to have been employed part-time by the defendant from March 1999 until June 1999 and again during November and December 1999. Documentary evidence also shows that Eliezer Lopez was hired in August 2002, and that Francisco Mendez was hired in April 2001.

On September 7, 2000, plaintiff filed a complaint with the New York City Commission on Human Rights charging the defendant and Penn with an unlawful discriminatory practice in violation of the Administrative Code of the City of New York. The Commission determined that there was no probable cause to believe that the defendant or Penn had engaged in or were engaged in the alleged unlawful discriminatory practices. On December 13, 2001, the Equal

Employment Opportunity Commission issued to plaintiff a right-to-sue letter.

## II. CONCLUSIONS OF LAW

*FLSA Claim*

Rosso asserts a claim under FLSA for unpaid overtime compensation pursuant to 29 U.S.C. § 207(a)(1). Rosso contends that he has established a violation of FLSA's overtime pay provision for the relevant period because he has shown that: (1) he was an employee of Pi Management; (2) he was covered by the statute because Pi Management was an "enterprise engaged in commerce;" and (3) Pi Management violated FLSA by not paying him overtime compensation for the hours he worked in excess of 40 hours per week.

The overtime pay provision of FLSA states, in pertinent part, that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The statute's "maximum hours provisions, like the other portions of the Fair Labor Standards Act, are remedial and humanitarian in purpose." Giles v. City of New York, 41 F. Supp. 2d 308, 316 (S.D.N.Y. 1999). For this reason, FLSA "must not be interpreted or applied in a narrow, grudging manner." Id.

### 1.  *Overtime Compensation*

An individual is covered by 29 U.S.C. § 207(a)(1) if he or she is an "employee" for the purposes of FLSA. In determining whether an individual meets this requirement, the Second Circuit has applied an "economic reality test." Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988)(citing United States v. Silk, 331 U.S. 704, 67 S. Ct. 1463 [1947]); see

10

also <u>Zheng v. Liberty Apparel Co., Inc.</u>, 355 F.3d 61, 66-69 (2d Cir. 2003); <u>Schwind v. EW &</u>

<u>Assoc., Inc.</u>, 357 F. Supp. 2d 691, 700-01 (S.D.N.Y. 2005). The factors comprising the

"economic reality test" include: (1) the degree of the employer's control over the worker; (2) the

worker's opportunity for profit or loss and his investment in the business; (3) the degree of skill

and independent initiative required to perform the work; (4) the permanence or duration of the

working relationship; and (5) the extent to which the work is an integral part of the employer's

business. <u>See</u> <u>Brock</u>, 840 F.2d at 1058-59. No single factor of the economic reality test is

dispositive; rather "the test is based on a totality of the circumstances." <u>Id.</u> at 1059. "The

ultimate concern is whether, as a matter of economic reality, the workers depend on someone

else's business for the opportunity to render service or are in business for themselves." <u>Id.</u>

The evidence at trial showed that Rosso worked as a building superintendent for Pi

Management for approximately two years, from September 1997 until November 1999, as a full-

time, permanent employee. Penn, Pi Management's Property Coordinator, supervised Rosso

during this period and Rosso received his work assignments and hours from her. Specifically,

Penn directed Rosso to be on the premises each day at 7:00 a.m., to remain in the building during

his lunch hour, and to perform the duties of a doorman, as well as those of a building

superintendent. There is no evidence in the record that Rosso had any investment interest in Pi

Management or that he received any opportunity for profit or loss during the period of his

employment there. Further, although Rosso brought certain skills to the job of building

superintendent, including those he acquired in his previous position at the Building, nothing in

the record suggests that he used his skills in an independent way. Finally, Rosso worked

exclusively for Pi Management during the relevant period and, in his capacity as a superintendent

11

and doorman, was an integral part of that company's management of the Building. Therefore, the totality of the circumstances demonstrate that, as a matter of economic reality, the plaintiff was an employee of the defendant for the purposes of FLSA at all times during the parties' working relationship. The defendant has not argued or provided evidence to the contrary.

An individual is covered by FLSA if he or she is employed by an "enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 203 (s)(1), § 206(a), § 207(a)(1). An enterprise is "engaged in commerce" if it "has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and . . . [its] annual gross volume of sales made or business done is not less that $500,000." 29 U.S.C. § 203(s)(1). The term "enterprise" in the context of the statute means "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r).

As amended in 1974, 29 U.S.C. § 203(s) has been interpreted to mean that an "enterprise engaged in commerce" includes local businesses "whose employees use materials which have at some point moved in interstate commerce." Marshall v. Baker, 500 F. Supp. 145, 149 (N.D.N.Y. 1980); see also Archie v. Grand Cent. P'ship, 997 F. Supp. 504, 530 (S.D.N.Y. 1998)("[L]ocal business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have moved or been produced in interstate commerce."). For example, an apartment complex in New York, in which maintenance personnel purchased janitorial and other supplies which had been manufactured outside New York, was found to be an enterprise engaged in commerce under FLSA. See Marshall, 500 F.

Supp. at 148. Similarly, a public parking garage in which employees handled cars brought to New York City, see Velez v. Vassallo, 203 F. Supp. 2d 312, 329 (S.D.N.Y. 2002), and a nonprofit organization whose employees used, among other things, radios, books and flashlights which "undoubtedly moved in interstate commerce," Archie, 997 F. Supp. at 530, also were found to fall within the reach of the statute. Furthermore, in order to be covered by the statute, "the employee does not himself need to be involved in an activity that affects interstate commerce." Velez, 203 F. Supp. 2d at 328 (citation omitted). Thus, "virtually every enterprise in the nation doing the requisite dollar volume of business is covered by the FLSA." Archie, 997 F. Supp. at 530.

Pi Management manages twelve commercial real estate properties and is one of several businesses owned by James Pi. Taken together, James Pi's business entities constitute a unified enterprise for the purposes of FLSA because they are located at the same address, share mutually advantageous services, such as a payroll department, and are under the control of one person whose business purpose they serve. See Archie, 997 F. Supp. at 525-27. In addition, the employees of the enterprise, including building superintendents, doormen, security officers, supervisory personnel and office and accounting staff, undoubtedly handle or otherwise work on goods or materials that have moved in interstate commerce. Furthermore, testimonial and documentary evidence presented at trial supports the inference that the gross revenue of the enterprise in the relevant years almost certainly exceeded $500,000 per year.

As noted earlier, Pi Management employed fifteen people during 1999 and 2000; hence, the number of people employed at James Pi's interrelated businesses was at least that number. Assuming that each of these persons was paid at the same rate as the plaintiff, that is, $550 per

week (a conservative estimate), the company's payroll costs were over $400,000 per year in the relevant period. With the addition of overtime pay, health insurance provided to other employees, taxes paid on all employees and other expenses, such as the use of a car service, it is likely that the company's operating costs alone are at least $500,000 per year. Moreover, the defendant has offered no evidence to the contrary. See Velez, 203 F. Supp. 2d at 329. Therefore, the Court finds that the defendant is an enterprise engaged in commerce for the purposes of FLSA.

"There is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours." Giles, 41 F. Supp. 2d at 317; see also Jacobsen v. Stop & Shop Supermarket Co., No. 02 Civ. 5915, 2003 WL 21136308, at *3 (S.D.N.Y. May 15, 2003)("If an employer seeks to pay a non-exempt employee a weekly salary that includes a premium overtime component calculated at time and one half of an hourly rate, there must be an express agreement to such an arrangement."). Thus, "[u]nless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours." Giles, 41 F. Supp. 2d at 317.

In this case, the defendant argues that Rosso's gross pay of $1,100 for each two-week period of his employment represented compensation for 80 hours of work at the regular rate of $10 per hour, and 20 hours of work at the overtime rate of $15 per hour. The defendant also notes that, for the periods ending December 11, 1998, and April 2, 1999, the plaintiff received "extra" overtime pay. The defendant concludes that the plaintiff was paid in full on the basis of

the time sheets he submitted.

The Court disagrees. The defendant's explanation of the terms of Rosso's employment is not sufficient to rebut the presumption in favor of Rosso's testimony that, when he was hired by Pi Management, he understood his weekly salary to cover 40 hours per week. The Court also finds credible Rosso's testimony that he spoke to Penn about the nonpayment of overtime on more than one occasion and was promised compensation for his extra hours of work. More importantly, there is no evidence in the record that the parties expressly agreed to an arrangement whereby Rosso's weekly salary was intended to include a premium overtime component. Rather, it appears that Rosso's weekly salary of $550 was intended to cover only the first 40 hours of work. Therefore, the Court finds that the plaintiff has established a violation of FLSA's overtime pay provision.

2.   *Calculation of Damages*

Based on a review of the evidence presented at trial, as well as the parties' post-trial written submissions, the Court finds that the plaintiff is entitled to damages under FLSA for the failure to pay him for overtime hours worked in excess of 40 hours per week during the period September 22, 1997, through November 12, 1999. As already noted, Rosso was paid $550 for a 40-hour week. Thus, the regular rate at which he was employed was $13.75 per hour, and his overtime rate was $20.63, or one and one-half times the regular rate. The plaintiff's submissions establish that, during the relevant period, he worked 1,132.16 hours of overtime. Consequently, the plaintiff was owed $23,356.46 in overtime pay. Since the plaintiff has been compensated for $79.50 of that amount, he is now owed $23,276.96 in overtime pay.

3.    *Liquidated Damages*

FLSA provides that an employer who violates the provisions of 29 U.S.C. § 207 is liable

to the employee affected, in the amount of his or her unpaid overtime compensation and "in an

additional equal amount as liquidated damages." 29 U.S.C. § 216(b). In the context of FLSA,

"[l]iquidated damages are not a penalty exacted by the law, but rather compensation to the

employee occasioned by the delay in receiving wages due caused by the employer's violation of

the FLSA." Gustafson v. Bell Atlantic Corp., 171 F. Supp. 2d 311, 326 (S.D.N.Y. 2001)(quoting

Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 [2d Cir. 1999]).

If an employer can show that it acted in good faith and that it honestly intended to

ascertain what FLSA requires and to comply with it, a court may, in its discretion, reduce or deny

an award of liquidated damages. See id. However, the employer bears the "difficult" burden of

proving its good faith and reasonableness, "with double damages being the norm, and single

damages the exception." Id. (quoting Herman, 172 F.3d at 142); see also Moon v. Kwon,

248 F. Supp. 2d 201, 234 (S.D.N.Y. 2002).

In this case, the defendant has failed to demonstrate a good faith attempt to comply with

FLSA. Rather, Rosso's testimony, which Penn did not contradict, suggests that Pi Management

intended to pay Rosso overtime but failed to do so because of the costs associated with

renovation of the Building and a shortage of tenants. Therefore, it appears that the decision to

withhold overtime pay from Rosso was made knowingly. In any event, there is no evidence that

the defendant took steps to ascertain the requirements of FLSA and to comply with them. Since

the defendant has not met its burden of establishing good faith and reasonable grounds for the

failure to pay Rosso overtime, the Court lacks discretion to reduce the amount of liquidated

16

damages provided for in the statute. Thus, Rosso is entitled to a liquidated damages award of $23,276.96, an amount equal to the unpaid compensation.

    4.    *Attorney's Fees and Costs*

In an action brought pursuant to, *inter alia*, 29 U.S.C. § 207, "[t]he court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b); see also Herman v. Davis Acoustical Corp., 196 F. 3d 354, 357 (2d Cir. 1999)(finding that the FLSA "explicitly permits a district court to award attorney's fees in an action brought by an individual employee."). The Court finds that recovery of attorney's fees is warranted in this case, as provided in the statute. Accordingly, the plaintiff shall submit an application for the amount of his attorney's fees and costs.

*ADA Claim*

The ADA provides, in pertinent part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

To establish a prima facie case of disability discrimination, a plaintiff must show: (1) the plaintiff's employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability. See, e.g., Jacques v. Dimarzio Inc.,

386 F.3d 192, 198 (2d Cir. 2004). Although each element must be established for an ADA plaintiff to prevail at trial, see id., the "failure to make reasonable accommodation, when the employee has satisfied the first three elements of his claim, amounts to discharge 'because of' his disability." Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 (2d Cir. 2000).[1]

1.    *Covered Entity under the ADA*

Under the ADA, an employer is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day . . . ." 42 U.S.C. § 12111(5); 29 C.F.R. § 1630.2(e). Pi Management, part of the unified business enterprise owned by James Pi, qualifies as an employer under the ADA because, in 1999 and 2000, it employed at least fifteen people. Additionally, for the reasons discussed earlier, Pi Management, together with James Pi's photo, cruise and retail businesses, engaged in an industry affecting commerce.

2.    *ADA Disability*

The ADA defines the term "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In this case, the parties do not dispute that the plaintiff has a disability within the meaning of the

---

[1]If a plaintiff makes out a prima facie case of discrimination on the basis of disability, then the burden of production shifts to the defendant, which must proffer evidence of a legitimate nondiscriminatory reason for its actions. See Rodal v. Anesthesia Group of Onondaga, P.C., 369 F. 3d 113, 118 n.3 (2d Cir. 2004)(citing Regional Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 [2d Cir. 2002]). If the defendant carries its burden, then the presumption of discrimination drops out and the plaintiff must show that the proferred reason was merely a pretext for intentional discrimination. See id.

ADA.[2]

### 3.    *Reasonable Accommodation*

In establishing that he is "otherwise qualified" to perform his job, an employee must show that, with or without "reasonable accommodation," he can perform "the essential functions of the employment position [he] holds or desires." 42 U.S.C. § 12111(8). A "reasonable accommodation" may include, among other things, job restructuring, a modified work schedule, or reassignment to a vacant position. 42 U.S.C. § 12111(9)(B). The term "essential functions" has been defined to mean the "fundamental" duties associated with an employment position, as opposed to the "marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

The defendant argues that the plaintiff has not established his ADA claim because, among other things, he did not inform the defendant that he intended to return to work or required accommodation until August 2000, approximately ten months after he became ill.

"In general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." Rodal, 369 F. 3d 120 (quoting 29 C.F.R. pt. 1630 app. § 1630.9). However, the notice requirement may be waived where the plaintiff's disability is "obvious or otherwise known to the employer without notice from the employee." Felix v. New York City Transit Authority, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001). Hence, where an employer has "independent knowledge" of an employee's disability, the rule requiring a request for accommodation does not apply. Id.

In this case, the defendant was notified of the plaintiff's disability as early as November

---

[2]Rosso contends that he meets all three of the statutory criteria for a disability. Because the parties do not dispute that the plaintiff has established this element of his prima face case, the Court need not reach this claim.

16, 1999, the date on which it received a medical report from the plaintiff's physician stating that the plaintiff was under treatment for Bell's Palsy and would return to work within two weeks. The defendant received additional medical reports concerning the plaintiff's condition and his inability to work on November 23, 1999, and December 13, 1999. Additionally, the plaintiff testified that he called Penn approximately ten times between December 1999 and July 2000 to inform her of the status of his illness.

Although, at trial, Penn denied that Rosso had communicated with her during this period, she also admitted that, in fact, they had spoken in March 2000 and that Rosso had asked her on that occasion whether there were any openings for a building superintendent. Moreover, when questioned further on this point, Penn admitted that there had been a position open, but that since it was in another property managed by the defendant, she had not told the plaintiff about it.

Furthermore, there is no dispute that the defendant received a letter from the plaintiff in March 2000 in which he described his condition and asked for assistance in collecting proof that he had been injured on the job. The defendant contends that because the plaintiff's March 2000 letter makes no mention of the plaintiff's ability to return to work, it does not constitute a communication in the relevant sense. However, the letter indicates that the plaintiff is seeking to establish that he suffered a work-related injury, and also describes that injury, thereby alerting the defendant to the plaintiff's condition on that date. Finally, although the medical report prepared by Dr. Comas and submitted to the defendant on July 21, 2000, indicated that the plaintiff's disability was "total," the report also included the physician's comment that the plaintiff could do limited work. Moreover, in his accompanying letter, the plaintiff indicated that he wished to be informed of Penn's "decision." In light of the plaintiff's previous inquiries, Penn might well

have surmised that he was referring to a decision concerning his employment.

Under the circumstances, the Court finds that the plaintiff has met his burden of informing the defendant that an accommodation was needed so that he might resume his duties as a building superintendent. In any case, even if the evidence is not sufficient to establish that the plaintiff expressly requested reasonable accommodation, it appears that the defendant had "independent knowledge" of the plaintiff's disability without such explicit notice. See Felix, 154 F. Supp. 2d at 657 (finding that defendant was put on notice that plaintiff required accommodation where plaintiff's physician indicated plaintiff's limitations on work assessment form six months before accommodation was requested).

The defendant also argues that the plaintiff's ADA claim must fail because he was never promised that his position would be held open pending resolution of his medical condition and, in any case, there were no vacant superintendent positions at the time the plaintiff sought to return to work.

Attendance is an essential function of employment. See Robarge v. Potter, No. 01 CV 0417, 2002 WL 32061800, at *6-7 (E.D.N.Y. Mar. 14, 2002)(citing cases). Moreover, the "ADA does not require an employer to grant an employee an indefinite leave of absence." Stamey v. NYP Holdings, Inc., 358 F. Supp. 2d 317, 324 (S.D.N.Y. 2005)(citing cases); see also Mitchell v. Washingtonville Central School District, 190 F.3d 1, 9 (2d Cir.1999). However, a temporary leave of absence may constitute a reasonable accommodation under the ADA. See Karn v. Williams Advanced Materials, No. 02 CV 0852, 2005 WL 1397014, at *2 (W.D.N.Y. June 13, 2005)(finding that if plaintiff were only temporarily disabled, defendant would have been required to provide her with reasonable accommodation by providing her a short leave of

21

absence); Criado v. IBM Corp., 145 F.3d 437, 443 (1st Cir. 1998)(holding that a jury could find plaintiff's request for temporary leave to be a reasonable accommodation where plaintiff's physician believed that it would ameliorate her mental impairments). Furthermore, "a requested leave of absence is an unreasonable request for accommodation only in unusual circumstances." Powers v. Polygram Holding, Inc., 40 F. Supp. 2d 195, 201 (S.D.N.Y. 1999).

In Powers, the plaintiff, who suffered from a mental illness, sought and was granted a six-week leave of absence, followed by two additional one-month leaves of absence. However, the plaintiff's request for an additional month of leave, which would have resulted in an overall leave of absence of approximately seventeen months, was denied. See 40 F. Supp. 2d at 197. In concluding that a seventeen-week leave of absence was not so long as to constitute an unreasonable accommodation, the court noted that the plaintiff: (a) had asked for one continuous leave of absence; (b) had repeatedly kept his employer aware of his availability; (c) had established a satisfactory record of attendance in his prior two years of employment; (d) was able to return to work upon the completion of his leave of absence; and (e) was not hired to complete a specific, highly time-sensitive task. See id. at 200-201.

In this case, Rosso, like the plaintiff in Powers, asked for a continuous leave of absence: initially, he asked for a one-week vacation and then, at roughly one week intervals thereafter, notified the defendant, through his physician, that he still was not able to return to work. Additionally, Rosso called Penn seeking reinstatement to his former position or reassignment to a comparable position approximately sixteen weeks after he became ill. Moreover, Rosso had a satisfactory record of attendance in his prior two years of employment and, upon completion of his leave of absence, was able to perform the fundamental duties of a building superintendent,

22

provided that he was allowed to work away from the sunlight. The defendant could have provided accommodation for this disability without undue difficulty by assigning the plaintiff to a night shift, by reassigning him to a position in one of its other buildings, or by limiting his job responsibilities to those of a superintendent and eliminating the additional doorman and security tasks it required of him after it took control of the Building. Thus, under the circumstances, it does not appear that the plaintiff's request for a temporary leave of absence rendered him legally unqualified to work.

In addition, the plaintiff has met his burden of showing that a vacancy existed to which he might have transferred. See Jackan v. New York Dep't of Labor, 205 F.3d 562, 566-67 (2d Cir. 2000). As already noted, Penn acknowledged that, in March 2000, there was a position open in one of the defendant's properties. Moreover, Penn also admitted that Rosso's previous position at the Building became available in March 2000, when the individual who had replaced him temporarily was, in turn, replaced by a permanent employee. Since a vacancy existed to which Rosso might have been assigned after he had recovered from his illness, the defendant had a legal duty to help him identify such a position. See id. at 568 n.4. The defendant failed, however, to comply with this obligation or to initiate an "interactive process" with Rosso, whereby the full range of alternative positions open to him, and the appropriate reasonable accommodation which would have allowed him to fill one of those positions, might have been determined. See id. at 566 ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."); Felix, 154 F. Supp. 2d at 658 (noting that ADA regulations contemplate shifting the burden to the employer to initiate interactive process with employee after accommodation has been requested).

23

Hence, for the reasons set forth above, the plaintiff has shown that he was otherwise qualified to perform the essential functions of his job with reasonable accommodation.

As noted above, if an employee has established the first three elements of his ADA claim, the failure by the employer to make reasonable accommodation amounts to a discharge "because of" his disability. In this case, the plaintiff has shown that Pi Management is a covered entity within the meaning of the ADA and that he is a qualified individual with a disability. There is no dispute that the defendant made no effort to accommodate Rosso's disability or to initiate communication with him to determine his suitability for the positions that were open at the time he sought to return to work, in light of his need for accommodation. Hence, the plaintiff has shown that he was discharged "because of" his disability.

Furthermore, the Court finds that the defendant's proffered explanation for its actions are merely a pretext for intentional discrimination based on disability. Two of these reasons were addressed earlier in this writing. After reviewing the evidence presented at trial and in pre- and post-trial written submissions, the Court has found that: (1) the defendant received adequate and timely notice of the plaintiff's disability and of his need for accommodation; and (2) vacant superintendent positions were available at the time the plaintiff attempted to return to work. Moreover, the plaintiff's requested leave of absence constituted a reasonable accommodation under the circumstances. Hence, the defendant's claim that it never promised the plaintiff that his position with the company would be held open simply is not responsive to the question whether the defendant fulfilled its obligations as a covered entity under the ADA.

The defendant has offered a third explanation for its actions, namely, that because the plaintiff pursued a claim of total disability before the WCB, he was "not able" to return to his

former position of employment. This somewhat opaque argument appears to rely on a theory of judicial estoppel. That is, the defendant appears to contend that, because the plaintiff sought disability benefits through the WCB, he is judicially estopped from asserting that he was a qualified individual with a disability able to perform the essential functions of his job.

"The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding." Rodal, 369 F.3d at 118 (citing Mitchell, 190 F.3d at 6). Thus, to prevail on a claim of judicial estoppel, a party must show that "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." Id.

"[A] representation of complete disability" in a prior proceeding does not directly contradict an individual's ADA claim that he can perform certain essential job functions with reasonable accommodation if the prior proceeding failed to consider "the effect that reasonable workplace accommodations would have on the claimant's ability to work." Id. (citing Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 119 S. Ct. 1597 [1999]). Nevertheless, "when an individual's prior submission regarding his disability to an adjudicatory body contains a purely factual statement that directly contradicts a statement made in a subsequent ADA claim, and the two cannot be reconciled with any amount of explanation, judicial estoppel will preclude the ADA claim." Id. (quoting Parker, 204 F.3d at 334)(internal quotation marks omitted).

In this case, the defendant has not shown that the plaintiff's submissions to the WCB contained a "purely factual statement" that directly contradicted a statement made in the instant ADA claim. In his trial testimony, the plaintiff acknowledged that he had previously applied to

25

the WCB for disability benefits and that the first report submitted to the WCB "probably" indicated that he was totally disabled. Additionally, as noted above, a medical form, dated July 2000, and prepared by the plaintiff's physician, indicated that the plaintiff's disability was "total," but that he was able to do limited work. However, none of this constitutes evidence that the plaintiff, in his submissions to the WCB, made a factual statement of the sort contemplated by the law in this circuit, that is, a statement that presented an "irreconcilable direct conflict" with a statement made as part of the plaintiff's ADA claim. Rodal, 369 F.3d at 119; cf. Mitchell, 190 F.3d at 7 (plaintiff who asserted before, inter alia, WCB that he could not stand or walk at work was estopped from asserting the contrary in ADA claim). Instead, it appears that, in this case, the different purposes of the two statutes means that the plaintiff's statement to the WCB that he was too disabled to work did not conflict with his later statement, made as part of his ADA claim, that he was not too disabled to work. See id. (citing Cleveland, 526 U.S. at --, 119 S. Ct. at 1602).

Furthermore, the WCB did not render a judgment favorable to the plaintiff in this case. Rather, on January 31, 2002, the WCB issued a decision denying the plaintiff's claim for disability benefits, based on its finding that his Bell's Palsy was not causally related to any incident at work. An administrative decision affirming the disallowance of plaintiff's claim was issued on December 11, 2002. Therefore, under the circumstances, the defendant has not established that judicial estoppel applies in this case.

Accordingly, for the reasons set forth above, the Court finds that the plaintiff has established his claim of discrimination based on disability.

    4.    *Calculation of Damages*

26

The ADA provides that a successful plaintiff shall have available the same remedies that would be available to a plaintiff pursuant to Title VII. See 42 U.S.C. § 12117(a). This entails, among other things, an award of back pay. See 42 U.S.C. § 2000e-5(g)(1). "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." Id.

"The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination." Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 145 (2d Cir.1993)(citations omitted). Therefore, the award should consist of lost wages, including any anticipated raises or benefits. See id. In most cases, an applicant denied employment in violation of the law is entitled to an award of back pay from the date of wrongful termination until the date of judgment. See id. at 144-145. Back pay is not allowed, however, for time periods in which a plaintiff was totally unable to work, see Meling v. St. Francis College, 3 F. Supp. 2d 267, 276 (E.D.N.Y. 1998), or in which a plaintiff received compensation for other work, see Sands v. Runyon, 28 F.3d 1323, 1327-28 (2d Cir. 1994). "Back pay should be calculated to the date of judgment, and should ordinarily include compound interest." Sands, 28 F.3d at 1328.

The plaintiff claims that he is entitled to back pay in the amount of $140,800, for the period from the date of the defendant's violation of the ADA until the date of the anticipated entry of judgment, that is, 256 weeks. However, the plaintiff has failed to account for the time he was unable to work -- mid-November 1999 until March 2000 – or the time that he was employed elsewhere. At trial, the plaintiff testified that he found a temporary position, for approximately two weeks, as a building superintendent for another company, and that he currently held a

position parking cars, from which he earned $280 per week. Since the record evidence does not indicate the amount of the plaintiff's earnings during the period he worked as a building superintendent, the amount of back pay to which he is entitled for this period cannot be determined. For the period the plaintiff has worked parking cars, that is, from approximately mid-January 2003 through at least November 17, 2004, the date of trial, he is entitled to $270 per week in back pay.

Adjusted to reflect these omissions, the record supports the plaintiff's claim that he is entitled to $107,040, with interest, as back pay up to the time of trial.[3] The plaintiff shall have until January 18, 2006, to supplement his application for back pay to reflect the period between trial and this decision.

The plaintiff also seeks punitive damages in the amount of $50,000. A court may award an ADA plaintiff punitive damages when the plaintiff "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his] federally protected rights." 42 U.S.C. § 1981a(b)(1).[4] Under the federal standard for imposing punitive damages, malice and reckless indifference refer to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Ass'n, 527 U.S. 526, 535, 119 S. Ct. 2118, 2124

_____

[3]This figure reflects the total amount of back pay sought for the relevant period (259.5 weeks x $550/week), minus sixteen weeks during which the plaintiff was unable to work (16 weeks x $550/week), two weeks during which the plaintiff's earnings cannot be determined (2 weeks x $550/week), and 95.5 weeks during which the plaintiff earned $270 less than he would have earned had he worked for the defendant (95.5 weeks x $270/week).

[4]The maximum recovery allowed under the ADA for a combined amount of non-economic compensatory and punitive damages, from a defendant with more than fourteen but fewer than 101 employees, is $50,000. See 42 U.S.C. § 1981a(b)(3)(A).

(1999). Further, "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard . . . [such as, where] the employer [is] simply . . . unaware of the relevant federal prohibition." Id. at 536-37, 2125.

In this case, the evidence shows that Pi Management failed to take adequate steps to ensure compliance with the ADA and, therefore, acted with reckless indifference to the plaintiff's rights under the statute. At trial, Penn testified that she had never received any training in how to supervise employees, fair employment practices, or equal employment opportunities regulations, and that she had never received an employee handbook or any company equal employment opportunity policy. Thus, Penn may not have been aware of the federal prohibition against disability discrimination. However, the defendant has not provided any evidence of a good faith effort to comply with the ADA by establishing that it had an antidiscrimination policy in place and that it made a good faith effort to enforce it. See Markus v. Teachers Insur. & Annuity Ass'n College Retirement Equities Fund, No. 03 Civ. 646, 2005 WL 742635, at *8 (S.D.N.Y. Mar. 29, 2005). Consequently, Pi Management is liable for any wrongs committed by Penn within the scope of her employment. See id. Moreover, it does not appear that the defendant sought or obtained advice with respect to its obligations under the ADA or that it made any attempts to assist Rosso to return to work with a reasonable accommodation. See Meling, 3 F. Supp. 2d at 274-75. Therefore, the Court finds that punitive damages in the amount of $20,000 are warranted in this case.

5.    *Attorney's Fees and Costs*

A prevailing plaintiff in an ADA action may recover reasonable attorney's fees. See 42 U.S.C. § 12205. Accordingly, the plaintiff shall submit an application for the amount of the

attorney fees and costs incurred in connection with this action.

*Title VII Claim*

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Claims of discrimination brought under Title VII are analyzed in accordance with the three-part evidentiary framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under that framework, the plaintiff must present a prima facie case of discrimination. If the plaintiff meets this burden, a presumption of unlawful discrimination arises and the burden shifts to the defendant, who must adduce evidence that an adverse employment action was taken for a legitimate, non-discriminatory reason. This burden is merely one of production, not persuasion. If the defendant states a legitimate, non-discriminatory reason, the presumption of discrimination falls out of the case and the plaintiff must prove, by a preponderance of the evidence, that the reason offered by the defendant was merely a pretext for discrimination. To do so, the plaintiff must show that the stated reason was false and that discrimination was the real reason for the employer's action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508-520, 113 S. Ct. 2742, 2747-54 (1993); Cagle v. Unisys Corp., No. 99 Civ. 9575, 2003 WL 21939705, at *4 (S.D.N.Y. Aug. 13, 2003).

In order to establish a prima facie case of discrimination under Title VII, Rosso must show that: (i) he was a member of a protected class; (ii) he qualified for the subject position; (iii) he suffered an adverse employment action; and (iv) the adverse employment action occurred

30

under circumstances giving rise to an inference of discrimination.  See <u>Abdu-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 466-67 (2d Cir. 2001); <u>Chertkova v. Connecticut Gen. Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996).  The burden of establishing a prima facie case is *de minimis*.  <u>See</u> <u>Abdu-Brisson</u>, 239 F.3d at 467.  Furthermore, "[t]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of Title VII analysis."  <u>Finney v. Planned Parenthood of New York City, Inc.</u>, No. 02 Civ. 7942, 2003 WL 22928730, at *3 (S.D.N.Y.  Dec. 10, 2003)(citing <u>Zimmermann v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 381 [2d Cir. 2001]); <u>see also</u> <u>De La Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.</u>, 82 F.3d 16, 20 (2d Cir. 1996)("In order to establish the prima facie case of discrimination, plaintiff must demonstrate that . . . either the position remained open or he was replaced by someone not a member of his protected class.").

The plaintiff, who is a Hispanic man with black skin, belongs to a protected class.  In addition, there is no dispute that during the two-year period that he was employed by the defendant, the plaintiff was qualified for the position he held.  Moreover, the defendant's determination not to reinstate the plaintiff to his previous position as a superintendent constituted an adverse employment action.  Furthermore, the record before the Court indicates that the plaintiff's primary successor to the position of Building superintendent was an Asian man and, hence, an individual outside the plaintiff's protected class.  Therefore, the plaintiff has made the minimal showing required to establish a prima facie case of discrimination based on race.  <u>See</u> <u>Finney</u>, 2003 WL 22928730, at *5 (finding that plaintiff, an African-American woman, established a prima facie case of race discrimination by showing that she was replaced by a

woman who, as a Latina, was "outside the protected class"); De La Cruz, 82 F.3d at 20 (finding that, where plaintiff, who was Puerto Rican and, thus, a member of a protected class, was replaced by a black female, he satisfied the fourth prong of his prima facie case of national origin discrimination).

Since the plaintiff has established his prima facie case, the defendant must proffer a legitimate, non-discriminatory rationale for its actions. As discussed earlier in this writing, Pi Management maintains that it has provided such a rationale: (1) it was unable to determine whether Rosso intended to return to work; (2) it never promised the plaintiff that his job would be held open pending resolution of his medical condition and, in any case, there were no positions available at the time the plaintiff sought to return to work; and (3) the plaintiff was "not able" to return to the job because he was pursuing a disability claim with the WCB. In the context of the plaintiff's ADA claim, the defendant's proffered reasons for its actions were found to be merely a pretext for intentional discrimination based on disability. However, with respect to the plaintiff's Title VII claim, the Court finds that, despite the insufficiency of the defendant's proffered explanation, the plaintiff has not shown that the adverse employment action to which he was subjected occurred under circumstances giving rise to discrimination based on *race*.

The plaintiff contends that the defendant discriminated against him based on his race because, when he tried to return to work, he found that he had been replaced as superintendent of the Building by an Asian man and, moreover, his supervisor, Penn, made comments reflecting a discriminatory attitude, that is, she told him not to hail taxi cabs with black drivers. The fact that the person who took responsibility for performing the plaintiff's duties was, as an Asian man, outside his protected class, although sufficient for a prima facie showing of discrimination, is not

sufficient to satisfy the plaintiff's burden at this stage, in the absence of evidence suggesting discrimination. See Finney, 2003 WL 22928730, at *6. Moreover, even assuming that Rosso's account of Penn's behavior, which she denied, is accurate, in the absence of other indicia of discrimination, "the stray remarks of a decision-maker cannot prove a claim of employment discrimination." Abdu-Brisson, 239 F.3d at 468.

Further, it does not appear that the plaintiff has established such indicia. Specifically, the plaintiff has not shown that preferential treatment was given to similarly situated employees who were not black or Hispanic. The plaintiff asserts, but has not proved, that other building superintendents or doormen received health insurance or overtime pay. In addition, the evidence presented at trial shows that, during the relevant period, the defendant employed a black woman as an assistant to Penn and, after the plaintiff became ill, hired two Hispanic individuals to work in positions comparable to those held by the plaintiff. Therefore, under the circumstances, the plaintiff has not shown that discrimination based on race was the real reason for Pi Management's decision not to reinstate him to his former position. Accordingly, the plaintiff's Title VII claim must fail.

Based on the above, the Court finds that the defendant is liable to the plaintiff for damages sought to be recovered through this action, as follows: overtime pay in the amount of $23,276.96; liquidated damages in the amount of $23,276.96; back pay in the amount of $107,040; prejudgment interest on the back pay award, to be calculated by the Clerk of Court, at the rate referred to in 28 U.S.C. § 1961(a) for the relevant time period; and punitive damages in the amount of $20,000. In addition, the plaintiff shall have until January 18, 2006, to submit:

(i) an application for back pay reflecting the period between trial and this decision; and (ii) an application for the amount of his attorney's fees and costs.

Dated: New York, New York
    December 22 , 2005

SO ORDERED:

*Kevin Nathaniel Fox*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Mailed copies to:

Matthew Wojtkowiak, Esq.
Harold W. Suckenik, Esq.